**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| ANGELICA WATSON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:22-cv-192 (MTT) |
| | ) | |
| CITY OF WARNER ROBINS, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

Plaintiff Angelica Watson filed this action against the City of Warner Robins,
Georgia, former Mayor Randy Toms, and her former supervisors Bill Mulkey and Terry
Wood.  Doc. 11.  Watson asserts claims for sexual harassment, retaliation, retaliatory
harassment, and constructive discharge under Title VII of the Civil Rights Act of 1964
and the Equal Protection Clause of the U.S. Constitution pursuant to 42 U.S.C. § 1983.[1]
*Id*. ¶¶ 68-185.  The defendants have moved for summary judgment on all claims.  Docs.
32; 33; 34; 35.  For the following reasons, the City's motion for summary judgment (Doc.
32) is **GRANTED** in part and **DENIED** in part.  The City's motion for summary judgment
on Watson's claim of sexual harassment that occurred after July 10, 2020, (Doc. 32) is
**DENIED**.  The defendants are **GRANTED** summary judgment (Docs. 32; 33; 34; 35) on
all other claims.

---

[1] Watson expressly abandoned her § 1983 claims against the City.  Doc. 66 at 51 n.3.  And as will be
discussed, she conceded at the last possible moment that she failed to exhaust her constructive
discharge claim against the City.

# I. BACKGROUND[2]

## A. Factual Background

### 1. December 2019 – March 2020

Watson was hired by the City of Warner Robins, Georgia ("City") on December 30, 2019, as an Administrative Secretary in the Building and Transportation Department.  Docs. 32-2 ¶ 1; 66-1 ¶ 1.  As a new hire, Watson was a probationary employee.  Doc. 39 at 70:7-71:13. Watson reported to City Marshal/Code Enforcement Supervisor Terry Wood, who reported to Department Director Bill Mulkey.  Docs. 32-2 ¶ 2; 66-1 ¶ 2.  Randy Toms served as the City's Mayor from January 2014 to January 2022.  Docs. 32-2 ¶ 3; 66-1 ¶ 3.

Watson's workspace[3] was in the City Hall annex.  Doc. 66-3 ¶ 2.  This office space was on the first floor and the first space the public encountered when entering the annex.  Docs. 39 at 29:11-22; 66-3 ¶ 2.  Plexiglass and a counter separated Watson's desk from the public.  Docs. 39 at 115:19-116:16; 66-3 ¶ 2.  The space was approximately 14 feet wide by 25 feet long with two open cubicles; Watson used one, and Sarah Erps, who was hired in July 2020, used the other.  Docs. 32-9 ¶ 5; 39 at 32:3-14, 115:16-116:16; 66-3 ¶ 2.  A round table used as a common workspace sat

---

[2] Unless otherwise stated, these facts are undisputed and are from the defendants' statement of facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The defendants "collectively prepared a [single] Statement of Undisputed Material Facts," although they each filed separate motions for summary judgment.  Doc. 32-1 at 2 n.2.  The plaintiff obtained leave of Court to file a single response to all four motions, including the statement of undisputed facts, and the defendants filed a single reply brief.  Docs. 66; 67.  For convenience, the Court cites only to the City's statement of undisputed facts (Doc. 32-2).

[3] The parties' fight over what to call the space where Watson worked is a good example of the unnecessary litigiousness that plagues this case.  Watson vigorously challenged efforts to describe her "office" as a shared workspace notwithstanding her deposition testimony to that effect.  *Compare* Doc. 66-1 ¶ 65 *with* Docs. 39 at 37:13-22, 115:19-116:16; 66-3 ¶ 2.  Then at the motion hearing, Watson's attorney acknowledged that Watson "had a shared office."  Doc. 70 at 25:15.

between the open cubicles and a printer/copier was positioned about two feet in front of Watson's desk and four feet to the right.  Docs. 32-9 ¶ 5; 39 at 115:19-116:16; 66-3 ¶ 2. This space was used by various employees to get office supplies and pick up and return various forms of paperwork.  Docs. 32-9 ¶ 5; 39 at 36:10-19; 48 at 128:24-129:1; 51 at 86:7-13.  In the summer of 2020, a plastic COVID partition was installed between Watson's and Erps's desks.  Docs. 51 at 99:21-100:1; 66-3 ¶ 2.

Sometime in Spring 2020, Wood spoke to Watson about an accounting error she made when entering deposit information, a random and inconsequential fact then, but one with some alleged significance later.   Docs. 39 at 105:23-106:10; 32-9 ¶ 4.

In March the City issued a general stay-at-home directive in response to the COVID-19 pandemic.  Docs. 33-2 ¶ 17; 39 at 29:1-24; 66-1 ¶ 17.  During this time, Watson and other employees reported to work in person on a staggered basis.  Docs. 33-2 ¶ 17; 39 at 33:7-36:9; 66-1 ¶ 17.

*2. April-June 2020*

Beginning around April 2020, Watson says she was subjected to a pattern of unwelcome sexual harassment by Joel Davenport, a technician in her department and the son-in-law of Toni Graham, the City's Director of Human Resources.  Docs. 32-2 ¶¶ 4, 18-19, 35; 66-1 ¶¶ 4, 18-19, 35.  Davenport had no supervisory authority over Watson, but he worked in the annex, and he was often alone with her when she was one of the few employees present during the pandemic.  Docs. 32-2 ¶ 4; 66-1 ¶ 4; 66-3 ¶¶ 3-4.  Davenport's harassment included lewd comments about his personal sex life, other inappropriate comments, and "advances" toward Watson, such as repeated

solicitations for sex.[4]  *See*, *e.g.*, Docs. 39 at 58:9-24, 59:6-15, 65:4-18; 43-14 at 1, 3-5.
Watson refused Davenport's advances, telling him she was not interested.  Doc. 39 at
56:1-9.  Watson felt confused and intimidated by Davenport's behavior and was
concerned about being alone with him.  Doc. 39 at 59:13-20, 59:21-60:2.

In June 2020, Davenport "came into [Watson's] office and grabbed [her] arm,
wrist, and hand and pulled on [her] to try to get [her] out of the chair [she] was sitting in
to go to the bathroom so that he could have sex with [her]."  Doc. 66-3 ¶ 5; *see* Doc. 39
at 60:12-62:22.  Watson pulled her arm away, and told Davenport to let go, whereupon
Davenport walked out of the room.  Doc. 39 at 61-62.  Watson now refers to this
incident as an attempted rape.[5]  Docs. 66 at 3; 66-3 ¶¶ 5-7.

### 3. Sexual Harassment Policy

The City has a No-Harassment policy prohibiting any form of harassment based
on sex.[6]  Docs. 32-2 ¶¶ 7, 9; 66-1 ¶¶ 7, 9.  To report harassment, an employee must
contact their supervisor or the Human Resources Director.  Docs. 32-2 ¶ 10; 66-1 ¶ 10.
If the employee's supervisor is involved, the employee may proceed directly to the
Human Resources Director or the Mayor.  Docs. 32-2 ¶ 10; 66-1 ¶ 10.  Upon receipt of

---

[4] For example, Davenport told Watson that she was "hot" and questioned whether they needed to maintain social distance.  Docs. 39 at 58:1-59:6; 43-14 at 3.  He mentioned having an "open marriage" and indicated that he and his wife could see other people.  Docs. 39 at 56:1-25; 43-14 at 3.  Davenport also asked Watson out multiple times, despite her refusals.  Doc. 39 at 56:1-25, 58:25-59:5.  Davenport told Watson sex would relieve her stress and suggested they have sex in the office bathroom.  *Id.* at 58:9-24, 59:6-15, 65:4-18.  He also repeatedly asked Watson to have sex in her new pool, and suggested he and Watson could "exchange services" when Watson mentioned her broken lawnmower.  *Id.* at 58:15-59:5.

[5] According to the defendants, Watson "never … complained to anyone at the City" about an "attempted rape."  Doc. 67 at 14 n.11

[6] The policy also prohibits retaliation against an employee who complains of harassment and states that any person found to have retaliated against an employee is subject to disciplinary action.  Docs. 32-2 ¶ 13; 66-1 ¶ 13.

a complaint, the City's Human Resources Director is required to conduct a prompt and thorough investigation. Docs. 32-2 ¶ 11; 66-1 ¶ 11. At the conclusion of that investigation, the policy requires the Mayor, the affected department director, and the Human Resources Director to determine whether the complaint was founded. Docs. 32-2 ¶ 11; 66-1 ¶ 11. If founded, the Mayor, the department director, and the Human Resources Director are required to promptly formulate a plan for remedial action. Docs. 32-2 ¶ 12; 66-1 ¶ 12. As part of her new-employee orientation, Watson was informed of the City's No-Harassment policy, including what it is, how to report harassment, and how complaints are investigated. Docs. 32-2 ¶ 14; 66-1 ¶ 14.

   *4. July 10, 2020*

   Watson first reported Davenport's behavior to her supervisors on Friday, July 10, 2020. Docs. 33-2 ¶ 20; 66-1 ¶ 20. Watson first told Wood, her direct report, that Davenport had made sexual comments to her and she expressed concern that Davenport's behavior could affect Erps. Docs. 33-2 ¶ 21; 39 at 66:18-67:17; 66-1 ¶ 21. Wood apologized and told Watson to speak with Mulkey. Doc. 39 at 67:18-68:25. Watson told Mulkey about Davenport's sexual advances and said she felt like she could not go to HR because the HR Director was Davenport's mother-in-law. Doc. 39 at 68:12-69:4. Watson did not mention Davenport's physical confrontation—the alleged attempted rape—to either Wood or Mulkey. Docs. 32-2 ¶ 24; 66-1 ¶ 24. Much later, she claimed both Wood and Mulkey "cut her off" before she could get to that. Doc. 39 at 66:24-68:1, 76:11-78:12. Mulkey asked Watson what she wanted to do, and Watson asked for the weekend to think about it. *Id.* at 68:23-69:3. Also, Mulkey said he would speak with Davenport and asked Watson "if she would be comfortable continuing to

work with Davenport." Docs. 32-2 ¶ 25; 66-3 ¶¶ 8-10. Watson said she would. Docs. 39 at 71:20-72:1; 66-3 ¶¶ 8-10. However, Watson denies that Mulkey asked her, as he claims he did, specifically "whether she would be comfortable with Davenport walking into her office or '… where he [might] have to walk by her workspace and go to the printer.'" Docs.32-2 ¶ 25; 66-1 ¶ 25; 66-3 ¶¶ 8-10, 53. After speaking with Watson, Mulkey and Wood decided they would report Watson's complaint to City Attorney Julia Mize first thing Monday morning, bypassing Davenport's mother-in-law. Docs. 32-2 ¶ 26; 66-1 ¶ 26.

Watson testified that later that day Wood came into her office, sat down at the round table, kicked his feet out, put his hands behind his head, and asked her, "You're on your year probation, aren't you?" Doc. 39 at 70:8-12. Watson said yes, and Wood asked, "When is it up?" *Id.* at 70:13-14. She replied, "December." *Id.* at 70:15. Wood responded with, "Oh, okay," and then left the room. *Id.* at 70:15-16. Watson said later she perceived this as retaliation for her complaint about Davenport. Docs. 39 at 190:23-191:3, 191:16-19; 66 at 47.

    *5. July 13, 2020*

On Monday, July 13, 2020, Mulkey and Wood met with Davenport, who denied Watson's allegations. Docs. 32-2 ¶ 28; 66-1 ¶ 28. Davenport testified he was then told to stay away from Watson. Doc. 51 at 92:18-20, 93:19-20. But Davenport responded that he needed to use the printer/copier in the shared workspace; Mulkey said that he would figure it out. *Id.* at 92:21-93:14.

Following that conversation, Mulkey spoke with city attorney Mize and relayed what Watson had told him. Docs. 32-2 ¶ 30; 66-1 ¶ 30. "Mulkey and Mize [then] met

with [Mayor] Toms … [and] discussed the hiring of an outside investigator to conduct an investigation into [Watson]'s complaint against Davenport."  Docs. 32-2 ¶ 33; 66-1 ¶ 33. Mize asked Mulkey to get a statement from Watson memorializing what she told him. Docs. 32-2 ¶ 26, 30; 66-1 ¶ 26, 30.

Mulkey and Wood met with Watson later that day and "asked [her] to provide a statement memorializing what she had reported to them on July 10," which she did either that day or the next.  Docs. 32-2 ¶ 31; 66-1 ¶ 31.  Watson's written statement requested that she not be left alone with Davenport, and she wrote that she was "happy with [her] decision and [that she] wish[ed] to take no additional actions against [Davenport], unless the sexual advances or behavior continues."  Docs. 32-2 ¶ 32; 39-5; 66-1 ¶ 32.

### 6. Investigation and Disciplinary Action

The City hired attorney Angela Couch to investigate Watson's complaint.  Docs. 32-2 ¶ 39; 66-1 ¶ 39.  On August 25, 2020, Couch interviewed several City employees, including Watson, Davenport, Wood, Mulkey, Whit Decker, and Lamar Wright, a city maintenance worker.  Docs. 32-2 ¶ 40; 43-14 at 2, 14; 66-1 ¶ 40.  Watson provided detailed accounts of Davenport's behavior, including specific instances of inappropriate comments and advances.  Doc. 43-14 at 2-5.  Watson also "told Couch the alleged harassing conduct had stopped after she initially complained on July 10, and that, as of her August 25, 2020 interview with Couch, 'things [were] fine now with [] Davenport.'" [7] Docs. 32-2 ¶ 41 (alteration in original); 66-1 ¶ 41.  Davenport again denied the allegations but admitted to some conversations that were generally consistent with

---

[7] Watson claims this is disputed because her statement to Couch was in the context that Davenport was no longer coming into her office but she was not "fine."  Doc. 39 at 86:6-11.

Watson's claims.  Doc. 43-14 at 5-8.  Other interviewees, such as Decker and Wright, corroborated much of Watson's account and described her as genuinely upset and uncomfortable.  *Id.* at 16.

Couch's September 25, 2020 report concluded that Watson's allegations were credible.  Docs. 32-2 ¶¶ 42-43; 43-14 at 15; 66-1 ¶¶ 42-43.  Couch's report was the first time a physical encounter with Davenport was reported to anyone at the City.  Couch wrote that she asked Watson about "any physical contact" between her and Davenport, and Watson replied that Davenport grabbed her hand on one occasion.  Doc. 43-14 at 4.  According to Couch, Watson mentioned that she was not physically intimidated by Davenport, but Watson was "a little uncomfortable" with the situation because Davenport mentioned his mother-in-law was in charge of HR when he asked Watson to have sex in the bathroom.  *Id.*  Couch wrote that Watson described her emotional journey from being annoyed by Davenport's comments to feeling offended, and eventually intimidated and worried as the behavior continued.  *Id.*  Despite the harassment, however, Watson stated that she liked her job and felt that the City had handled the matter appropriately after she reported it.  *Id.* at 4-5 ("[Watson] was surprised to learn that there was more investigating and was not expecting to talk with anyone else about the situation.").

Couch recommended providing Watson a way to obtain water without passing through Davenport's office, which the City had already done, and monitoring the situation for future issues.  *Id.* at 16-17.  Couch further recommended that Davenport be disciplined but not terminated because he had no prior disciplinary history.  *Id.* at 16. "Upon reviewing the investigative report and after consulting with Mize and Mulkey,

Toms decided to suspend Davenport for three days without pay and required him to complete eight hours of sexual harassment training."  Docs. 32-2 ¶ 46; 66-1 ¶ 46.

### 7. October 2020

On October 21, 2020, Wood spoke to Watson about another accounting error involving a deposit.  Docs. 39 at 105:23-106:10; 32-9 ¶ 4.  "Wood … had similar conversations with other direct reports about their performance issues, including Erps and other employees preceding [Watson] in her position, as well as code enforcement officer Josh Ross."  Docs. 32-2 ¶ 61; 66-1 ¶ 61.  Wood spoke to Watson about errors on no more than two occasions.  Doc. 39 at 105:23-106:10, 106:6-10.

On October 22, 2020, "Toms, Mulkey, and Mize met with Davenport … to advise him of his discipline."  Docs. 32-2 ¶ 48; 66-1 ¶ 48.  They reminded Davenport that sexual harassment would not be tolerated and that any further harassment would result in additional discipline and possible termination.  Docs. 32-2 ¶¶ 49-50; 66-1 ¶¶ 49-50.

Davenport "completed his twenty-four hours (i.e., three full workdays) of unpaid disciplinary leave over four days (i.e., October 22, 23, 26 and 27, 2020) and completed his required training by October 30, 2020."[8]  Docs. 32-2 ¶ 52; 66-1 ¶ 52; *see* Docs. 46 at 15:20-20:14; 51 at 106:5-109:20.

---

[8] With considerable effort but no basis in fact, Watson's lawyers dispute this even though Watson submitted a declaration acknowledging that Davenport was suspended for three days without pay and required to undergo additional sexual harassment training.  Doc. 66-3 ¶ 21.  Her lawyers attempt to construct a theory based on various payroll records and Wood's personal calendar to argue that Davenport was never actually suspended.  Docs. 66 at 11; 66-1 ¶ 52; *see* Docs. 43-5; 43-18.  But Davenport's payroll record for the applicable bi-weekly pay period reflects that he was paid $13.4495 for 80 hours of work instead of his ordinary hourly pay rate of $19.2136.  Doc. 43-5 at 11.  Melanie Byer, one of the City's 30(b)(6) witnesses, testified that when regular pay is listed on a check but less than 80 hours of time was worked (such as when there is leave without pay), the City's computer system calculates the hourly rate by taking the total earnings and dividing it by the number of hours listed which results in a lower hourly rate.  Doc. 46 at 19:16-24.  She testified that there were 24 hours of leave without pay during this pay period even though it showed 80 hours of regular pay, and this adjustment lowered the hourly rate from $19.2136 to $13.44 per hour.  Docs. 46 at 19:16-20:5; 43-5 at 11.  Watson's lawyers claim that Byer admitted that "a jury reasonably could conclude that Mr. Davenport was never suspended" based on

On October 27, 2020, the defendants claim "Mulkey and Wood met with Davenport … and Mulkey directed Davenport to be 'cordial and polite in [Watson's] presence.'" Doc. 32-2 ¶ 51. Watson disputes this. Doc. 66-1 ¶ 51. She cites Davenport's testimony that he was told to stay away from her, as evidence that he was instructed not be around her at all, regardless of whether others were present.[9] Docs. 51 at 87:7-13 ("I was told to stop talking or having any interaction with her."); 66-1 ¶ 51; 76 at 4. In other words, as best the Court can tell, Watson disputes whether, or exactly when, Davenport was told that he should not be in her presence under any circumstance. In any event, Watson acknowledges that "[o]n October 28, 2020, Mize met with [Watson] to advise her that the investigation had been concluded, the investigator credited [Watson]'s allegations, and that Davenport had been disciplined." Docs. 32-2 ¶ 54; 66-1 ¶ 54.

Also on October 28, the City's HR director, Davenport's mother-in-law, informed Mize that Mulkey had contacted her "to inquire about discipline of" Watson for "work performance issues that had been ongoing for [four] months but had never been

---

his payroll records. Doc. 66-1 ¶ 52. That is not what Byer said. Byer was asked if someone looking at the payroll records could conclude that Davenport worked 80 hours. Doc. 46 at 20:15-18, 20:24-21:4. Byer replied that "[a] person could think that, if they don't have all the information." *Id.* at 21:8-9. This does not create a genuine issue of fact over whether Davenport was actually suspended without pay.

A leave slip signed by Wood on October 28, 2020, reflects 24 hours of unpaid leave for Davenport covering October 22, 2020, October 23, 2020, October 26, 2020, and October 27, 2020—and Watson herself acknowledges that Davenport was "ostensibly" docked $461.13 in pay during the relevant period. Docs. 43-12; 66-1 ¶ 52. This is consistent with Byer's testimony about how the City's computer system calculates unpaid leave for any given pay period. Apparently still looking for a theory, Watson's lawyers seem to argue that Davenport was not actually suspended without pay because he received a $1,000 bonus in the next bi-weekly pay period. Doc. 66 at 11-12. Mize testified that the bonus was issued to all employees who, like Davenport, worked during COVID. Doc. 53 at 94:3-16, 175:5-178:10.

[9] Mize testified that prior to April 13, 2021, Davenport had only been given some kind of directive not to be alone with Watson. Doc. 53 at 106:14-16. It is also possible that the instructions given to Davenport may have changed following the conclusion of Couch's investigation. Watson testified that from July 10, 2020 to August 25, 2020, Davenport did not enter her office. Doc. 39 at 86:6-11, 88:5-8.

documented." Docs. 43-16 at 1; 53 at 150:17-23. The issue involved possible bank deposit errors. Doc. 48 at 120:23-121:25; *see* Doc. 43-16 at 1. Mize told both Mulkey and the HR director that Watson should be evaluated based solely on her work performance. Doc. 43-16 at 1. Mulkey also testified that he had no intention of disciplining Watson and was only following procedure. Doc. 48 at 122:9-14. It was determined two other administrator assistants were making the same mistake, and Mize testified that training for all three was recommended as the appropriate course of action. Docs. 43-16 at 1; 53 at 151:1-18. Although Watson denies that this training occurred, it is undisputed that Watson "never received any formal, written discipline during her employment with the City." Docs. 32-2 ¶ 62; 66 at 63; 66-1 ¶ 62; 66-3 ¶ 22.

*8. November 2020*

After Davenport was disciplined, Davenport did not make further sexual comments to or advances toward Watson, but she claims he continued to harass her by coming into her "office" at least six or seven times between late October 2020 and April 13, 2021.[10] Doc. 39 at 106:23-109:2, 110:10-111:2, 112:1-114:23, 116:17-118:3, 119:5-120:23, 121:7-23.

On November 2, 2020, Watson claims she reported three issues to Mize. First, Watson told Mize that "someone was logging into her computer without authorization," which she believed was an attempt to intimidate her. Docs. 32-2 ¶ 64; 32-6 ¶ 7; 39 at 101:10-24, 138:20-140:2; 66-1 ¶ 64. Mize and Toms claim they "were unable to substantiate these concerns." Docs. 32-2 ¶ 64; 32-6 ¶ 7; 66-1 ¶ 64. But Watson says

---

[10] Watson also testified that Davenport often watched her walk to her car and that Davenport "sat in [her] office and stared at her without saying anything." Docs. 39 at 87:11-88:4, 125:7-9; 66 at 14. But Watson testified that she never told anyone at the City that Davenport watched her walk to her car or that he sat in her shared office and stared at her. Doc. 39 at 87:22-88:4, 194:12-196:18.

"IT" told her files had been deleted from her computer.  Docs. 39 at 101:19-102:25; 66-1 ¶ 64; 66-3 ¶ 30.  The deleted files apparently belonged to a former City employee on military leave, and Watson claims they should not have been on her new computer. Doc. 39 at 101:19-103:5.  Watson also testified that she noticed that the icons and files on her computer desktop had been moved on multiple occasions.  Doc. 39 at 138:20-140:2.  There is no evidence from "IT" explaining all this.

Second, Watson claims Mize asked her "whether [] Davenport was still coming into her office, and [] Watson replied that he was."  Docs. 39 at 125:10-22; 66-1 ¶ 55. Mize does not recall having this conversation and claims that it would have been in her notes had it occurred.  Doc. 53 at 113:24-114:17.

Third, Watson told Mize that "she had heard that Wood and Mulkey were directing other employees, Gloria Williams and Sarah Erps, to monitor her work so that she could be terminated." [11]   Docs. 32-2 ¶ 55; 66-1 ¶ 55.  Wood acknowledged that he asked Williams, as lead administrative assistant, to let him know about any errors by

---

[11] Watson testified that City Police Officer Julius Wilcox, who has no known involvement in relevant events, told her that Williams told Wilcox that Wood told Williams that Mulkey and Wood had asked employees to monitor Watson's work so they would have a reason to fire her.  Doc. 39 at 98:15-101:5, 99:2-15,100:8-101:2, 192:21-194:8, 201:1-4.  The parties dispute whether Watson's testimony about Wilcox's hearsay statement is admissible.  Docs. 70 at 31:6-32:18; 73 at 2-9; 76 at 15 n.2.  Watson does not argue that Wilcox's statement is admissible as an admission by an agent of the City. Fed. R. Civ. P. 801(d)(2)(D).  Rather, she argues that a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.  Doc. 76 at 15 n.2; *see Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir.1999). Watson argues that "Wilcox's statement that Gloria Williams had told him about monitoring … Watson can be considered by this Court … since they both can testify at trial."  Doc. 76 at 15 n.2; Fed. R. Evid. 801(c) & 805.  However, if the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement, the Eleventh Circuit has held that the hearsay statement cannot be considered at the summary judgment phase. *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir.1996); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012).  Here, Williams's hearsay statement is contradicted by her sworn testimony in this case.  Doc. 32-3 ¶ 3.  Thus, Wilcox's hearsay statement about what Williams told Wilcox cannot be considered for purposes of summary judgment. *Macuba*, 193 F.3d at 1322 (holding even if the statements could be admitted at trial for impeachment purposes, they could not be considered as substantive evidence); *see Jones*, 683 F.3d at 1294.  Therefore, Wilcox's statement about what Williams told him cannot be considered by the Court.

Watson or any other administrative personnel, because Williams had identified errors made by both Watson and Erps, when entering deposit information.[12]  Docs. 55 at 130:4-11; 32-9 ¶ 4.  "Later that day … Mize and Toms met separately with Williams and Erps and both denied being asked to monitor [Watson]'s work so she could be terminated."  Docs. 32-2 ¶ 56; 66-1 ¶ 56.  Erps and Williams later provided affidavits stating they were never told to monitor Watson's work.[13]  Docs. 32-3 ¶ 3; 32-5 ¶ 3.  After speaking with Williams and Erps, Mize met with Watson and assured Watson that she was not being targeted and that no one was asked to monitor her work so that she could be terminated.  Docs. 32-2 ¶ 63; 32-6 ¶ 7; 66-1 ¶ 63.

Three weeks later, on November 20, 2020, Watson told Mize that Davenport had come into her office to use the printer/copier.  Docs. 32-2 ¶ 65; 32-6 ¶ 8; 39 at 108:1-109:6; 66-1 ¶ 65.  Mize told Mulkey the City should buy a second printer/copier for Davenport to use outside of Watson's presence, which was done at a cost $6,000.[14]

---

[12] It is undisputed that Williams was responsible for reconciling certain deposit accounts and that she had identified errors made by Watson and other employees, which she pointed out to Wood and/or Mulkey. Docs.  32-2 ¶¶ 57-58; 66-1 ¶¶ 57-58.

[13] *See* Doc. 66-1 ¶ 56 ("Plaintiff does not have any evidence to dispute Defendants' representation of the conversations between Ms. Mize and former Mayor Toms and Ms. Williams and Ms. Erps … [but] Ms. Watson continues to assert that those individuals had been told to monitor her work performance in order to justify getting rid of her.").

[14] Watson claims this is disputed because Mulkey had been informed by Mize on at least two prior occasions, July 13, 2020 and October 22, 2020, that he needed to buy a "second printer/copier that Mr. Davenport could access outside of Ms. Watson's office and presence," but he took no action until after November 20, 2020.  Doc. 66-1 ¶ 66.  The deposition testimony cited by Watson does not support the contention that Mize told Mulkey to purchase a second printer/copier on October 22.  Rather, Mulkey testified that Mize told him to obtain a second printer/copier sometime in November, and Mize testified that, after Watson came to her on November 20, she asked Mulkey to "buy a not inexpensive office copier for Mr. Davenport to access in a different location, and he did that."  Docs. 48 at 122:20-123:17; 53 at 106:9-19.

Moreover, when Mize was asked about the directive given to Davenport on October 22 and her meeting notes stating that she "spoke with Bill Mulkey and told him to please provide J.D. with an alternate printer location and that J.D. should not be in A.W.'s presence"—Mize corrected Watson's attorney to make clear

Doc. 48 at 123:16-17; *see* Docs. 32-2 ¶ 66; 66-1 ¶ 66.  Wood also reminded Davenport that he was not supposed to be alone with Watson.  Doc. 55 at 92:25-93:14.

On November 28, 2020, Watson filed a report with the Warner Robins Police Department regarding Davenport's sexual harassment in May 2020 and the June 2020 physical encounter.  Docs. 39 at 128:1-7, 130:3-15; 39-9.  Watson spoke with an Officer Jones and Sergeant Shane Mann, who, Watson says, initially seemed willing to investigate.   Docs. 39 at 132:2-11; 45 at 8:5-13.  However, the incident report states that Officer Jones told Watson that she could seek her own arrest warrant from the Magistrate Court and that the Police Department would not investigate further.[15]  Doc. 39-9 at 2.

The Police Department's 30(b)(6) witness, Chief of Police Ronald Fisher, testified that the officers' response was consistent with Department practices and procedures based on the facts that were reported, the nature of the offense (i.e., simple battery), the delayed report of the alleged offense, the fact that Watson was able to identify the offender, and the fact that there were no witnesses to the physical altercation for the police to interview.   Doc. 45 at 17:1-10.

---

that her notes referred to a conversation that took place on November 20, 2020, not October 22.  Docs. 43-16 at 2; 53 at 105:9-106:12.

[15] This statement was not captured by either Officer Jones's or Sergeant Mann's body camera footage. Watson refers to this as a "confliction point" in the evidence.  Doc. 66 at 13.  However, text messages between Watson and a City employee in another department strongly suggest that Officer Jones called Watson to inform her of the need to seek an arrest warrant from the Magistrate Court.  Doc. 39-31 at 17-19.  Therefore, the statement would not have been captured by body camera.  More importantly, Watson testified in her deposition that the narrative contained in the incident report is accurate.  Docs. 39 at 130:7-20; 39-9 at 2.

*9. 2021*

On January 7, 2021, Watson filed a charge of discrimination with the EEOC against the City.  Doc. 39-23.  The charge listed multiple instances of Davenport's harassing conduct which Watson claimed was ongoing.  *Id.* at 1-2.  Watson also claimed that she faced a retaliatory hostile work environment because her work and workspace were scrutinized and monitored following her complaints of sexual harassment.  *Id.*

Later that month, Watson again raised with Mize her concerns over computer tampering.  Doc. 39 at 138:20-139:3.  According to Watson, Lamar Wright told her in January 2021 that one of Wood's "buddies" from IT was in the office after hours and that he saw people go into Watson's office and turn on lights after she was gone for the day.  Docs. 39 at 104:4-21; 66-3 ¶ 30.  Watson also sent text messages to Maggie Williams, a City employee in another department, claiming someone accessed her computer "multiple" times between November 2020 and January 2021.  *See* Docs. 39 at 104:22-105:22; 39-31; 66-3 ¶ 28.

On April 1, 2021, Watson sent Williams another text message stating that she felt the City took her complaints of "the continued and unrelenting harassment" by Davenport as if it "was no big deal" and that she had reached a breaking point.  Docs. 39-31 at 35-36; 66-3 ¶ 36.

On April 13, 2021, Davenport was momentarily alone with Watson when he retrieved "a copy of a document in a common work area."  Doc. 43-1 at 2. Consequently, Davenport was reminded that he should not be alone with Watson.  *Id.*

Later that day, Watson was assisting someone at the public counter in her shared workspace.  Doc. 39 at 147:5-148:21.  City employees David Hale and Josh Ross spoke with Erps about a code enforcement issue.  *Id.* at 147:21-22.  Davenport entered the workspace and called Mulkey to ask if he and Hale could remove the COVID partition separating Watson's and Erps's desks.[16]  *Id.* at 147:5-148:21.  Mulkey instructed Davenport and Hale to remove the partition, which they did.  Docs. 48 at 128:1-20; 32-8 ¶ 6.  Watson then complained to Mize about Davenport's presence.  Docs. 39 at 148:22-150:12; 32-2 ¶ 76; 32-6 ¶ 9; 66-1 ¶ 76.  Watson said she "was completely distraught, crying, shaking, hyperventilating, and felt traumatized."  Doc. 66-3 ¶ 37.  Mize told Watson she could leave for the day which she did.  Docs. 32-6 ¶ 9; 39 at 150:13-15; 66-3 ¶ 40.  The same day, Watson emailed Mulkey, Wood, and Mize stating that she perceived the partition-removal incident as continued sexual harassment by Davenport.  Docs. 43-6; 66-3 ¶ 40.  Ken Fenell, the City's Employment & Benefits Manager, then spoke with Mulkey who instructed Davenport that he should not be around Watson under any circumstances.  Docs. 32-2 ¶ 78; 43-1 at 2; 53 at 193:14-25; 52 at 27:6-19, 29:6-18, 74:5-20; 66-1 ¶ 78.

On April 15, 2021, Mize informed Watson that Davenport had been instructed to stay away from her while an investigation was conducted.  Doc. 66-3 ¶ 45.

On April 16, 2021, Mulkey informed Fennell of a $100 cash shortage in a deposit Watson made on April 12, 2021.  Doc. 43-1 at 3.

In response to Watson's complaint, Fennell investigated both the partition-removal incident and the deposit issue.  Doc. 43-1.  First, Fennell's report states that the

---

[16] Watson claims she spoke with Wood on April 12, 2021, about removing the partition between her and Erps's desk but was told that it was not allowed to be taken down.  *Id.* at 147:13-17.

partition-removal incident occurred when Ross, Hale, and Erps were speaking in the front reception area of Watson's shared workspace.  *Id.* at 2-3.  Davenport entered the area to speak with Hale and noticed that the COVID partition was in bad shape and should be removed.  *Id.* at 3.  After calling Mulkey, Davenport removed the partition.  *Id.* The entire incident lasted between 5-10 minutes.  *Id.*  During this time, Davenport did not interact with Watson.  *Id.*  However, Fennell wrote that Watson appeared upset to other employees who were present.  *Id.* at 2.

Second, Fennell concluded that a $100 cash shortage was discovered in a deposit handled by Watson.  *Id.* at 3.  The report indicated that an investigation involving multiple City employees and departments determined that the shortage was due to a computation error by Wells Fargo Bank.  *Id.* at 3-5.

Because the April 13 partition-removal incident caused Watson to have a "panic attack," Watson sought medical care and requested various forms of leave.  Docs. 33-2 ¶ 81; 43-6; 43-1 at 2; 66-1 ¶ 81.  At her request, Watson "was placed on paid administrative leave on April 13, 2021, used paid sick leave on April 14 and 15, 2021, [used] annual leave on April 16, 2021, and took twelve weeks of leave under the Family Leave and Medical Act from April 19 through July 9, 2021."  Docs. 33-2 ¶ 81; 66-1 ¶ 81.

On May 19, 2021, Watson requested 180 hours of donated sick leave from the City's Sick Leave Pool Committee.[17]  Docs. 33-2 ¶ 81; 32-8 ¶ 9; 66-1 ¶ 81.  Mulkey

---

[17] The sick leave pool appears to be a system within the City of Warner Robins where employees can request additional sick leave hours from a collective pool, especially in cases where they have exhausted their own sick leave.  *See generally* Doc. 47.  This pool is managed by a committee, comprised of employees from various departments, which reviews and approves or denies requests considering the nature of the illness or injury and the employee's previous use of sick leave from the pool among other things.  Docs. 46 at 6:21-7:3; 47 at 6:20-7:10, 9:15-12:9.  In 2021, the committee had between nine and eleven members.  Doc. 47 at 6:20-25.

recommended approval,[18] and the Committee granted Watson's request in early June 2021.  Docs. 33-2 ¶¶ 81, 83; 32-8 ¶ 9; 66-1 ¶¶ 81, 83.  Watson submitted a second sick leave pool request for 160 hours on June 24, 2021.  Docs. 33-2 ¶ 84; 32-8 ¶ 10; 66-1 ¶ 84.  This time, Mulkey recommended denial of Watson's request because she had been on leave since April 13, 2021, and her continued absence made department operations difficult.[19]  Doc. 32-8 ¶ 10.  The Committee ultimately denied Watson's second request based on Mulkey's recommendation and the Committee's concern that Watson's issue had not resolved.[20]  Doc. 47 at 12:10-14:17.

During Watson's leave, Fennell communicated several times with Watson regarding her options—she could request leave without pay, she could apply for advanced sick leave, or she could return to work.  Docs. 39-17; 52 at 116:1-11, 117:20-25, 118:6-18, 119:1-18.  Fennell followed up with Watson regarding her leave status after Watson's second request for donated sick leave was denied.  Doc. 52 at 116:1-13.

---

[18] Watson claims this is disputed, but she does not cite any evidence that Mulkey opposed her first request for donated sick leave, nor does she deny that Mulkey recommended approval.  Instead, Watson argues, because Mulkey attempted to have her disciplined in October 2020 and April 2021, "it is a reasonable inference that [Mulkey] felt his 'hand was forced' and recommended approval of the first sick leave pool request begrudgingly."  Doc. 66-1 ¶ 83.  In short, it undisputed that Mulkey recommended approval of Watson's first request for donated sick leave.

[19] Watson argues, without citing any evidence, that after "begrudgingly" recommending approval of her first request, Mulkey "felt empowered to recommend denial of the second request, and did so, but not for the reasons set forth in his Declaration.  Instead, [she argues] it is a reasonable inference that [Mulkey] made that second recommendation because he felt it would complete his retaliatory intent to get rid of [her]."  Doc. 66-1 ¶ 83.

[20] Ron Smith, the Chairman of the City's Sick Leave Pool Committee, testified the committee members understood that Watson was on leave because she had PTSD after an interaction with an unnamed employee.  Doc. 47 at 6:6, 10:7-11:24, 12:1-9, 22:5-12, 24:17-23.  Smith also testified that the name of the employee involved and the nature of the interaction were redacted from the documents provided to the committee.  Id. at 11:6-12:9.  Smith submitted Watson's request to the committee along with documentation from Watson's doctor that stated Watson  "… is suffering from severe mood issues since being assaulted at work … [and] is afraid for her safety."  Docs. 43-16 at 1; 47 at 10:7-11:24, 12:1-9, 22:5-12, 24:17-23, 27:11-28:15, 49.

Watson did not reply, so Fennell followed up with her a second time on July 22, 2021. *Id.* at 117:17-25.  And although Watson did not request leave without pay, apply for advanced sick leave, or return to work—Fennell testified that her employee status did not change after July 23, 2021, and that Watson remained on unpaid leave until May 2022 with the City paying both the employee and employer portion of her health insurance premiums.  Docs. 33-2 ¶ 81; 32-4 ¶ 7; 52 at 103:19-25, 119:1-18; 66-1 ¶ 81.

### 10. 2022

On April 13, 2022, Fennell informed Watson in writing that Davenport was no longer employed by the City[21] and that Watson's position remained open. [22]  Docs. 32-2 ¶ 85; 66-1 ¶ 85.  Fennell asked Watson to let him know by April 22 if she wanted to return to work.  Docs. 32-2 ¶ 85; 66-1 ¶ 85.

On April 22, 2022, Watson replied that she "remain[ed] interested in returning to full-time employment," but needed assurances regarding the prevention of future harassment and retaliation.  Docs. 32-2 ¶ 86; 66-1 ¶ 86 (alteration in original).  In a May 9, 2022 emailed letter, Fennell reiterated that Davenport was no longer employed with the City and that the City would continue to ensure a safe work environment.[23]  Docs. 32-2 ¶ 87; 66-1 ¶ 87.  In the same letter, Fennell confirmed that Watson's medical insurance had remained in effect throughout her leave, with the City paying both the

---

[21] Davenport resigned on November 17, 2021, after he allegedly sexually harassed another female employee.  Docs. 43-2 at 1-9; 43-1; 43-5; 66-3 ¶ 51.

[22] Watson claims this is disputed because the City could have informed her of Davenport's resignation prior to April 13, 2022.  Doc. 66-1 ¶ 85; *see* Doc. 66-3 ¶ 51.  There is evidence that Watson was aware of Davenport's termination as early as November 19, 2021.  Doc. 39-31 at 56-57.

[23] Watson claims this is disputed "to the extent that it" implies that "Fennell appropriately addressed [her] concerns or that the City had in fact been responsive to all of her complaints."  Doc. 66-1 ¶ 87.

employer and employee shares of the premium, and that the City would keep her position open until May 16, 2022.[24]  Docs. 32-2 ¶ 88; 66-1 ¶ 88.  When Watson failed to respond, Fennell emailed Watson on May 19, 2022, a letter from Mulkey, informing Watson that because she had not responded to the City's May 9 letter, "her employment was being separated as a voluntary resignation, effective May 16."  Docs. 32-2 ¶ 89; 66-1 ¶ 89.  Mulkey made the decision to separate Watson's employment because of her failure to respond by May 16, but neither Toms, who was no longer mayor, nor Wood, who was not the department director, had any involvement in the decision.[25]  Docs. 32-2 ¶¶ 90-91; 66-1 ¶¶ 90-91.

### 11. Watson's Subsequent Criticisms

During discovery, Watson voiced several criticisms of the City's handling of her complaints and Couch's investigation, and she walked back some of her admissions.

---

[24] Watson disputes that the City paid her insurance premiums, claiming, initially, that "[she] was required to pay the employee portion of health insurance premiums in the amount of $54.48 every other week." Doc. 66-1 ¶ 81 (citing Doc. 52 at 103:19-25).  In her deposition, Watson testified that she assumed that her insurance with the City had been terminated because Fennell told her she would need to "pay in" to keep her insurance with the City, which she did not do.  Doc. 39 at 161:7-11 ("Fennell … told me that I was not getting continuous pay and that in order for me to receive [insurance] … I would have to pay into it, which I was not.  So I assumed that my [insurance] had been terminated.").  At the motion hearing on December 11, 2024, Watson's attorney argued that the issue is whether the costs were deducted upfront from the premiums, even if Watson herself did not personally pay $54.48 every other week.  Doc. 70 at 4:11-5:22.  However, Watson was not receiving a regular paycheck from which health insurance premiums could be deducted, and although there was some indication in May or June of 2021 that Watson had between 14.5 and 17.5 hours of accrued leave from which the costs could be deducted, Fennell testified that both the employee and employer portion of the premiums were paid by the City.  Docs. 32-4 ¶ 7; 52 at 101:4-8, 102:25-103:12.  In short, Watson has no basis to dispute that the City paid both the employee and employer portion of her insurance premiums.

[25] Watson claims this is disputed; she argues Mulkey made the decision to separate her employment "to complete his retaliatory intent to get rid of her for complaining about sexual harassment."  Doc. 66-1 ¶¶ 90-91.  However, Watson does not cite any evidence disputing that Mulkey separated her employment because of her failure to respond, nor does she cite any evidence to dispute that Toms and Wood were not involved in the decision.  Id.  Instead, she suggests that Toms and Wood were somehow involved in making the decision to separate her employment "to complete [their] retaliatory intent to get rid of her for complaining about sexual harassment."  Id.  Watson does not specify how either Toms or Wood were involved in the decision, and she has expressly stated that she "does not allege that Mayor Toms was retaliatory."  Docs. 66 at 59 n.4; 66-1 ¶¶ 90-91.

First, Watson claims she was not comfortable being around Davenport at all, even if others were present, despite her written statement to the contrary.  Docs. 39 at 124:20-22;39-5; 66 at 39; 66-3 ¶ 12.  Watson also claims Davenport continued to work close to her throughout the summer of 2020, which terrified her, despite telling Couch things with Davenport were fine on August 25, 2020.  Docs. 32-2 ¶ 41; 39 at 71:20-72:21; 66 at 39; 66-1 ¶ 41; 66-3 ¶ 14.

Second, Watson claims that she felt pressured to agree to continue working with Davenport and that she felt like Wood and Mulkey were not taking her complaint seriously, even though she told Couch that she was happy with how the City handled the situation.  Docs. 39 at 74:9-75:2; 66-3 ¶ 12.  Specifically, Watson testified at her deposition that she feels the City did not handle the situation appropriately, although she acknowledged that she might have told Couch otherwise out of fear for her job. Doc. 39 at 85:3-10.  Watson never told Couch that she feared losing her job, which Watson "disputes" because Couch never asked her that question.  Docs. 33-2 ¶ 45; 66-1 ¶ 45.  However, Watson acknowledged that it was possible that Couch, as Couch claims she did, provided Watson the opportunity to offer anything else further that she wanted to say at the end of their interview.  Doc. 39 at 85:20-23.  Third, Watson testified that Couch's report inaccurately described the physical interaction with Davenport, claiming he grabbed her hand and wrist, not just her hand.  *Id.* at 82:12-15.  Watson also claims that the report inaccurately stated that she was standing near the door when the incident occurred; she was sitting at her desk.  *Id.* at 80:22-81:11, 83:1-5. Watson later identified several other inaccuracies.[26]  There is no evidence Watson reported

---

[26] First, Watson disputes Couch's characterization of her emotional state in the report, claiming she was terrified, not just "kind of upset" or uncomfortable.  Docs. 39 at 81:25-82:14, 83:6-7; 66-3 ¶¶ 5-6.  Second,

these inaccuracies to anyone at the City.  Docs. 32-2 ¶ 44; 39 at 84:5-8, 250:12-22; 66-1 ¶ 44; 66-3 ¶ 19.

## B. Procedural History

The EEOC dismissed Watson's charge of discrimination on February 22, 2022, and issued a Determination and Notice of Rights.[27]  Doc. 39 at 209:20-210:11; 39-24. Watson filed this lawsuit against the City of Warner Robins on May 23, 2022.  Doc. 1. Watson filed an amended complaint on October 20, 2022, adding Toms, Wood, and Mulkey in their individual capacities as additional defendants.  Doc. 11.  Watson brings claims of sexual harassment, retaliation, retaliatory harassment, and constructive discharge under Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the U.S. Constitution pursuant to 42 U.S.C. § 1983.  Doc. 11 ¶¶ 68-97, 127-185. Watson argues that Davenport subjected her to sexual comments and conduct, creating a hostile work environment, and that the City and its officials—i.e., Toms, Mulkey, and Wood—failed to take appropriate remedial action to address the sexual harassment she faced, retaliated against her for her complaints, and created intolerable working conditions that led to her constructive discharge.  *Id.*  The defendants argue they are entitled to summary judgment on all claims.  Docs. 32; 33; 34; 35.

---

Couch wrote that Watson stated the situation did not impact her life outside of work and did not affect her work.  Doc. 43-14 at 5.  Watson testified that this is incorrect because the situation did impact her life outside of work, and she does not feel that the City handled the matter appropriately.  Doc. 39 at 85:1-10. Third, Couch wrote that Watson rated the severity of the situation from one in the beginning, to three, to five at the end (on a scale from one to ten).  Doc. 43-14 at 4-5. Watson testified that this is incorrect because she does not recall being asked to rate the severity and would not have rated what Davenport did to her a five.  Doc. 39 at 84:20-85:2; 66-3 ¶ 17.  Last, Couch wrote that Watson described herself as "hardened and not as sensitive" because she had worked in the construction industry.  Doc. 43-14 at 4. Watson disagrees with this characterization, arguing that she was not hardened and insensitive and does not recall saying that to Couch.  Doc. 39 at 83:9-22.

[27] The defendants argue that Watson did not advise the EEOC of post-January 7, 2021 conduct until March 7, 2022—after the EEOC had already issued its Notice of Rights.  Doc. 67 at 15-16 (citing Doc. 42-3 ¶¶ 3-11).

## II. STANDARD

A Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[]—that is, point[] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id*. at 1438 (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id*.

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id*. (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), "the court may … consider the fact undisputed for purposes of the motion[.]"  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

### A. Sexual Harassment Claim (Title VII 42 U.S.C. § 2000e-(2)(a)(1)) [28]

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's … sex."  42 U.S.C. § 2000e–2(a)(1).  Sexual harassment is considered a form of sex discrimination under Title VII.  *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020).  Sexual harassment is actionable if it results in either a tangible employment action or if it creates a hostile work environment.  *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006); *see Monaghan*, 955 F.3d at 861 ("[S]ome events are substantial enough standing alone to

---

[28] The City initially argued that Watson's Title VII sexual hostile work environment claim is time-barred because she failed to file a charge of discrimination with the EEOC within 180 days.  Doc. 32-1 at 9-10. However, at the motion hearing held on December 11, 2024, defense counsel acknowledged that there is sufficient evidence to show that Watson's EEOC charge filed on January 7, 2021, was timely under *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  Doc. 70 at 16:11-17:6.

be actionable.  These have sometimes been referred to as 'tangible' or 'adverse' employment actions … The terms are interchangeable.").

Watson relies on the second theory: she claims Davenport's conduct subjected her to a hostile work environment.[29]  Docs. 11 ¶¶ 68-78; 66 at 27-28; 76 at 4-8.  "To prevail in a suit against her employer for a fellow employee's sexual harassment that resulted in a hostile work environment, a plaintiff must prove five elements: (1) The employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of was 'sufficiently severe or pervasive to alter the terms and conditions of employment'; and (5) a basis for holding the employer liable." *Wilcox v. Corr. Corp. of Am*., 892 F.3d 1283, 1286-87 (11th Cir. 2018) (quoting *Reeves v. C.H. Robinson Worldwide, Inc*., 594 F.3d 798, 808 (11th Cir. 2010)).  The City moves for summary judgment only on the fifth element.  Doc. 32-1 at 10.

"[T]he basis of an employer's liability for a hostile work environment depends on whether the harasser is the victim's supervisor or merely a co-worker." *Gray v. Koch Foods, Inc*., 580 F. Supp. 3d 1087, 1113–14 (M.D. Ala. 2022); *Wilcox*, 892 F.3d at 1287.  When "the perpetrator of the harassment is not the plaintiff's supervisor," but a coworker, "the employer will be held … liable only if" the employer "knew or should have known of the harassing conduct" and "failed to take prompt remedial action." *Wilcox*, 892 F.3d at 1287.  Actual knowledge is established where an employee shows she complained to management, or that her employer had a clear, published policy setting

---

[29] Although Watson claims the hostile work environment persisted throughout her employment, it is undisputed that no harassment occurred before late March or early April 2020.  Docs. 32-2 ¶¶ 19-20, 38; 66 at 27; 66-1 ¶¶ 19-20, 38.

forth the procedure for reporting harassment, and she followed that procedure. *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000); *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982); *see Coates v. Sundor Brands, Inc*., 164 F.3d 1361, 1364 (11th Cir.1999) ("Only if we determine that adequate notice of the harassment was given to [employer] do we then move to determine whether [employer] responded reasonably to her complaint.").

Here, it is undisputed that Watson never complained about Davenport before July 10, 2020, and the City argues it took prompt remedial action once Watson complained. Docs. 32-1 at 11; 32-2 ¶¶ 19-20, 38; 66-1 ¶¶ 19-20, 38. But Watson argues that Davenport continued to sexually harass her by his occasional presence in the shared workspace and the City did not respond adequately to that perceived harassment. Doc. 66 at 27, 29, 37-38. The City, for some reason, does not argue that Davenport's post-July 10 conduct was not sufficiently severe or pervasive to alter the terms and conditions of Watson's employment. Rather, the City argues that Watson's reports of Davenport's "mere presence" in her shared workspace on a handful of occasions did not provide sufficient notice of continued sexual harassment that would require them to do more than they were doing. Docs. 32-1 at 10; 67 at 7-10. In other words, the City did not take additional action because it did not consider Watson's complaints to be sufficient notice of harassing conduct.

The City's No-Harassment policy requires an employee to contact their supervisor or the Human Resources Director to report harassment. Docs. 32-2 ¶ 10; 39-19 at 3; 66-1 ¶ 10. Watson testified that six or seven times between November 2020 and April 2021, Wood, her immediate supervisor, asked her if Davenport was still

coming into the shared workspace, and each time Watson confirmed that he was.  Doc. 39 at 140:3-9.  On one occasion, Wood unilaterally said he would speak to Davenport. *Id.* at 140:23-24.  On another, he chuckled and said Davenport "just doesn't want to listen."  *Id.* at 140:24-141:2.  There is evidence that Mize, the City attorney, also asked Watson in November 2020 if Davenport was still entering the shared office, and Watson said yes.  *Id.* at 125:13-22.  Because the HR director was Davenport's mother-in-law, Mize made herself available to Watson to report complaints.  Doc. 53 at 119:19-120:13. Watson spoke with Mize a second time later that month and, in Mize's own words, Watson "had made a report of [Davenport's] presence in her shared workspace getting a piece of paper off the printer [being] bothersome to her."  *Id.* at 108:11-16.  There is some evidence that the City knew Davenport continued to enter the shared office space after the City bought a second printer/copier for Davenport's use,[30] and that Davenport had violated instructions not to be alone with Watson on April 13, 2021.  These incidents are discussed in more detail below, but the relevant point now is that Watson says she reported conduct by Davenport that she thought was harassing.  Given that both Wood and arguably Mize were authorized and designated individuals to receive Watson's reports of sexual harassment, the "context and sufficiency of the conversation is a question properly resolved by a jury."  *Gray*, 580 F. Supp. 3d at 1117 (citing *Curry v. Koch Foods, Inc.*, 2019 WL 1281196, at *14 (N.D. Ala. Mar. 20, 2019)).

In short, the Court cannot say as a matter of law that Watson's complaints about Davenport's occasional presence were not sufficient notice of ongoing harassment.

---

[30] Fennell's report states that Davenport was momentarily alone with Watson on April 13, 2021, to retrieve "a copy of a document in a common work area."  Doc. 43-1 at 2.

**B. Retaliation Claim and Retaliatory Harassment Claim (Title VII, 42 U.S.C. § 2000e-(3)(a)) [31]**

Title VII prohibits an employer from retaliating against an employee for "oppos[ing] any practice made an unlawful employment practice by this title," (i.e., opposition clause) or for "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this title" (i.e., participation clause). 42 U.S.C. § 2000e-3(a); *see EEOC v. Total Sys. Servs., Inc.*, 221 F.2d 1171, 1174 (11th Cir. 2000). To establish a prima facie case of retaliation, the plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered an adverse action; and (3) that the adverse action would not have occurred but for the protected activity. *Patterson v. Ga. Pac., LLC,* 38 F.4th 1336, 1345 (11th Cir. 2022); *Gogel v. Kia Motors Mfg. of Ga., Inc.,* 967 F.3d 1121, 1135 (11th Cir. 2020).

Unlike § 2000e-2(a)(1), however, Title VII's anti-retaliation provision is not limited to discrimination with respect to compensation, terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-3(a). Thus, to satisfy the adverse-action-requirement a plaintiff need only show that a reasonable employee would have found the challenged action materially adverse, "'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-68 (2006).

If the plaintiff makes out a prima facie case, the burden shifts to the employer to produce legitimate, non-retaliatory reasons for the challenged action(s). *Gogel*, 967

---

[31] Because the Court concludes that Watson's claims fail on the merits, the Court does not address the City's argument that Watson failed to exhaust her administrative remedies for any alleged retaliatory acts that occurred after January 7, 2021. Doc. 32-1 at 9-10.

F.3d at 1135 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009));

*Patterson*, 38 F.4th at 1345. If the employer meets that burden, the plaintiff must

produce evidence creating a genuine issue of material fact that each reason stated by

the employer is merely a pretext for retaliation. *Raney v. Vinson Guard Serv., Inc.*, 120

F.3d 1192, 1196 (11th Cir. 1997); *Patterson*, 38 F.4th at 1345. This requires evidence

of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the

employer's stated reasons. *Gogel*, 967 F.3d at 1136.

Here, the parties assume, without getting specific, that Watson engaged in

protected activity.[32] Watson claims she faced several adverse actions because of her

protected activity, including being reminded that she was on probation, two

unsuccessful attempts by Mulkey to discipline her, increased monitoring of her work,

suspected tampering with her computer, "the Police Department's refusal to investigate

her criminal complaint against … Davenport," and the denial of her second request for

donated sick leave. Docs. 11 ¶¶ 79-85; 66 at 45-51. Watson alleges that each of these

actions are independently actionable and constitute discrete acts of retaliation. Doc. 11

¶¶ 79-85. She also alleges that cumulatively these actions created a retaliatory hostile

environment. *Id.* ¶¶ 86-92. A hostile work environment claim is a series of separate

acts that collectively constitute one "unlawful employment practice." *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–

5(e)(1)). Retaliatory hostile work environment claims, like retaliation claims based on

discrete acts, prevail if the conduct complained of "well might have dissuaded a

---

[32] It seems that Watson proceeds under the opposition clause, but the parties do not argue the point.
Doc. 11 at 2 ("This is an action for. . .unlawful retaliation and retaliatory harassment for [Watson's]
opposition to. . . unlawful discriminatory employment practices. . . .").

reasonable worker from making or supporting a charge of discrimination."[33]  *White*, 548 U.S. at 68; *see Monaghan*, 955 F.3d at 860-61.  In other words, Watson argues that even if each of the challenged actions alone was insufficient to state an actionable retaliation claim, when considered together these actions were materially adverse.

The City argues that Watson's list of alleged slights, separately or collectively, were not sufficiently adverse; did not create a retaliatory hostile work environment; and in any event, none were causally connected to her protected activity.  Docs. 32-1 at 13-16; 67 at 11-14.  Where applicable, the City also argues that Watson has not shown that the City's legitimate nondiscriminatory reasons for its actions were pretextual.  Doc. 67 at 10-15.  The Court agrees.

"Title VII … does not set forth 'a general civility code for the American workplace.'"  *White*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).  The Supreme Court has emphasized that the standards for judging materiality are intended to separate "significant from trivial harms" such as "petty slights, minor annoyances, and simple lack of good manners."  *White,* 548 U.S. at 68.  The Supreme Court has also emphasized that context matters, and whether an action qualifies as materially adverse will often depend on the particular circumstances.  *Id.* at 69 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); *see Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 648-49 (11th Cir. 2019) ("The test for

---

[33] *See Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1356 (11th Cir. 2024), *cert. denied sub nom. Terrell v. McDonough*, 2024 WL 4427203 (U.S. Oct. 7, 2024).

materiality is 'objective,' though 'the significance of any given act of retaliation will often depend upon the particular circumstances.'").

Given that standard of materiality, it is tempting, and maybe preferable, to reject summarily Watson's argument that the City's alleged slights would have dissuaded a reasonable employee from engaging in protected activity.  Doc. 66 at 45-51.  That is largely the approach taken by the City.  Docs. 32-1 at 13-16; 67 at 11-14.  But as the Court's lengthy recitation of facts suggests, Watson has flooded all zones with allegations, characterizations, innuendo, and long-after-the-fact revisionist accounts, often with no concern for self-contradiction.  Accordingly, the Court, reluctantly, undertakes to parse the slights by category.

First though, as the Supreme Court said, context matters, and Watson's slight list must be viewed in context.  By any measure, the City's response to Watson's July 10, 2020 report of Davenport's harassment was robust.  Wood and Mulkey accepted Watson's report at face value and followed her lead regarding whether Watson would be "comfortable continuing to work with Davenport."  Docs. 32-2 ¶ 25; 66-3 ¶¶ 8-10.  They confronted Davenport and instructed him to stay away from Watson.  Doc. 51 at 93:19-20.  Mulkey met with Toms to discuss an outside investigation.  Docs. 32-2 ¶ 33; 66-1 ¶ 33.  Watson's July 13 statement confirmed that she was "happy" with the City's response.  Doc. 39-5 at 2.  Following a thorough investigation, the City's outside investigator concluded that her allegations were credible.  Doc. 43-14 at 15.  Watson told the investigator that she thought the City had handled her report appropriately.  Docs. 32-2 ¶ 41; 66-1 ¶ 41.  When Watson left the workplace, allegedly because of the partition-removal incident, the City gave her 180 hours of donated sick leave, paid her

health insurance premiums, and kept her job open.  Docs. 32-2 ¶ 81; 66-1 ¶ 81.

Although Watson, long after the fact, tries to qualify some of the facts, they nonetheless

are undisputed.  When the facts are viewed in a light favorable to Watson, the City's

response was not perfect—Davenport occasionally was present in Watson's

workspace—but nothing in the City's response to Watson's complaints hints that

anyone was hostile to Watson's reports of Davenport's harassment.

### 1. Reminders of Probation

Watson claims that, after she complained about Davenport, Wood reminded her

of her probationary status, which she perceived as a threat.  Doc. 66 at 47.  Specifically,

Watson testified that "there was a few times," including on July 10, 2020, "where [Wood]

said, 'When is your probation up?' And [she] would say, 'The end of December.'  And

then there were several times that [Wood] mentioned … [her] probation – [that] [she]

was still on … probation." [34]  Doc. 39 at 70:7-17, 192:14-20.  When asked how many

times this occurred, Watson said several, but she could not recall how many.  Doc. 39

at 192:5-13 ("Q: …  Is [several] more than five? A: Possibly.  … Q: More than ten? A:

It's possible.").  Nor did she provide specific dates for any reminder aside from the July

10, 2020 conversation following her initial complaint.  *Id.* at 191:4-22.  Most importantly

though, Watson testified that the reminders were made only in passing.  *Id.* at 191:7-10,

192:11-13 ("Q: And he's just saying it to you in passing? A: Yes.").  Other than her

conclusory allegation that she perceived Wood's passing comments to be retaliatory

threats, Watson provides no argument, much less evidence, that Wood's comments

---

[34] Objectively, the perception of these conversations as threats would require more evidence about the broader context of these interactions and/or any specific behaviors or language that could be threatening. *See also Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 149 (11th Cir. 2021) ("[A] threat of termination, without more, is not a 'materially adverse' employment action.").

were retaliatory. For example, Wood never disciplined Watson for her work errors; on the contrary, he contemplated promoting Watson to lead administrative assistant. Docs. 32-2 ¶ 59-62; 39 at 106:6-10, 259:1-25; 66-1 ¶¶ 59-62.

In short, Wood's accurate and isolated comments on Watson's probationary status would not have dissuaded a reasonable employee from making or supporting a charge of discrimination. *See White*, 548 U.S. at 68-69. And when viewed in the context of the City's prompt investigation and acceptance of Watson's allegations, it is beyond any reasonable dispute that Wood's comments were not retaliatory.

*2. Monitoring/Scrutiny*

Watson argues that she felt she was subjected to increased scrutiny and monitoring after her July 10, 2020 complaint—Wood "watched her," a coworker told her she was being monitored, and she thought someone was "tampering" with her computer. Docs. 39 at 294:15-20, 295:12-296:4; 66 at 45-51.

First, Watson testified that following her complaint about Davenport, Wood came into her office once or twice a week and stared at her without saying anything for five to ten minutes, which she perceived as threatening. Doc. 39 at 171:24-172:25. However, Watson later admitted that Wood did not just sit and stare, rather Wood spoke with employees as they came into the workspace.[35] *Id.* at 171:24-173:24, 295:18-22. In fact, Wood testified that he would sit at the roundtable in the workspace because this

---

[35] Watson filed a declaration retreating from her admission, claiming that "[o]n these occasions …. Wood did not interact with any employees … he just stared at [her]." Doc. 66-3 ¶ 11. On a motion for summary judgment a party cannot create a genuine issue of material fact by submitting an affidavit that is inherently inconsistent with the party's deposition testimony unless there is a valid explanation for the conflict. *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (holding that a party may not "create such an issue [of fact] with an affidavit that merely contradicts, without explanation, previously given clear testimony"); *see Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987). Watson has offered no reason for this inherent inconsistency, and therefore the Court does not consider this contradictory testimony.

was a convenient spot to interact with employees who used the table to return and pick up various forms of paperwork and to sign paperwork.  Doc. 32-9 ¶ 5.  Wood's presence in such an environment cannot reasonably be perceived as targeted or intimidating and there is no evidence that Wood's presence was connected to Watson's protected activity.  In short, a reasonable employee, considering all the circumstances, would not view these relatively infrequent, brief interactions as materially adverse, and there is no evidence that Wood's behavior would not have occurred but for Watson's protected activity.

Second, even if Wood and Mulkey began scrutinizing Watson's work more closely and asked other employees to monitor her performance shortly after her complaints about Davenport, it is undisputed that Watson never received any formal discipline during her employment with the City.  Docs. 32-2 ¶ 62; 39 at 203:24-204:2; 66-1 ¶ 62.  Although Watson testified that she felt scrutinized following her complaints, she did not provide any detail about the scope, frequency, or nature of her supervisor's alleged surveillance—either before or after her complaints.  *See*, *e.g.*, Doc. 39 at 106:6-10, 295:12-296:4.  Without evidence that the perceived monitoring was somehow excessive or deviated from normal workplace practices for a probationary employee, Watson's testimony does not permit the inference that a reasonable employee in her position would have been dissuaded from making or supporting a charge of discrimination.  *See White*, 548 U.S. at 68-69.

Even if Mulkey considered disciplining Watson for work errors, it is undisputed that he did not, and Watson has acknowledged that Wood spoke to her about errors on no more than two occasions, one of which occurred before she complained of sexual

harassment.  Docs. 32-2 ¶¶ 59, 62; 32-9 ¶ 4; 39 at 105:23-106:10, 203:24-204:2; 66-1 ¶¶ 59, 62.  "On both occasions, Wood [simply] reminded [Watson] to be more careful and to double-check the deposits."  Docs. 32-2 ¶ 60; 66-1 ¶ 60.  Similar performance meetings were held with other administrative personnel, which indicates that Watson was not singled out for engaging in protected activity.  Docs. 32-2 ¶ 61; 32-3 ¶ 3; 66-1 ¶ 61.

Moreover, there is no evidence that these normal supervisor-employee interactions were causally related to Watson's protected activity.  Watson has not offered any evidence that either Wood or Mulkey did not believe that she had made the work errors that prompted their actions, and their honest belief that she had is a legitimate reason for Wood to ask the City's lead administrative assistant to let him know if she, or any other employee, made any mistakes, and for Mulkey's two unsuccessful attempts to discipline her; this is true even if their beliefs were ultimately mistaken.  Docs. 32-9 ¶ 4; 48 at 120:23-121:25; *see Lewis v. Blue Bird Corp.*, 835 F. App'x 526, 531 (11th Cir. 2020).  Accordingly, even when viewed in the light most favorable to Watson, the evidence does not create a genuine issue of material fact over whether either Wood's or Mulkey's legitimate, non-discriminatory reasons were pretext for retaliation.

Finally, even if someone accessed Watson's computer, there is no evidence that such access was improper employer activity.  Docs. 39 at 138:25-140:2; 66 at 18-19.  In any event, because Watson does not know who accessed her computer, she cannot show that it was related to her protected activity.  *Murray v. Learjet, Inc.*, 2024 WL 4707968, at *3 (11th Cir. Nov. 7, 2024) ("To prove causation involving a corporate

defendant, an employee must prove 'that the corporate agent who took the adverse action was aware of the plaintiff's protected' conduct, … or acted at the order of another individual motivated by retaliatory animus.") (quoting *Raney*, 120 F.3d at 1197; and *Llampallas v. Mini-Circuits, Lab, In*c., 163 F.3d 1236, 1249 (11th Cir. 1998)).

### 3. Failure to Investigate

Watson argues that the Warner Robins Police Department's failure to investigate her report against Davenport was somehow retaliatory.  Docs. 66 at 30-31, 48-49; 70 at 37:20-22.  Even if there was evidence that the officers acted with retaliatory intent (there is not), and even if their conduct could be attributable to the City as Watson's employer, the Police Department has given legitimate, nondiscriminatory reasons for its decision not to investigate.  Doc. 45 at 10:12-11:22.  Specifically, the Police Department's 30(b)(6) witness testified that the Department's response, i.e., advising Watson to obtain her own arrest warrant from the Magistrate Court, was consistent with its common practice for simple battery reports, especially given Watson's failure to report Davenport's conduct, the nature of the offense, and the fact that Watson had already identified the alleged perpetrator.  Docs. 45 at 10:12-11:22; 39-9 at 2.  While Watson now argues Officer Jones's and Sgt. Mann's body camera footage by omission somehow contradicts the Department's proffered reasons (Doc. 66 at 51), Watson testified that the police incident report is accurate.  Doc. 39 at 130:7-20.  That report states that Officer Jones advised Watson that because "so much time has elapsed and she had no witnesses that she could seek her own warrants through the Magistrate Court."  Doc. 39-9 at 2.  Apart from the incident report, Watson admits that Officer Jones

told her she could seek her own warrant from the Magistrate Court.  Docs. 39 at 130:7-20, 205:15-22; 39-31 at 17-19.

In short, there is no evidence that the Police Department's actions were retaliatory for protected activity, and, in any event, Watson has not established that the Police Department's legitimate nondiscriminatory reasons are pretextual.

*4. Denial of Second Request for Donated Sick Leave*

Watson requested and "was placed on paid administrative leave on April 13, 2021, [she] used paid sick leave on April 14 and 15, 2021, [she used] annual leave on April 16, 2021; [she] took twelve weeks of leave under the [FMLA] from April 19 to July 9, 2021," and Watson received 180 hours of donated sick leave in early June of 2021. Docs. 32-2 ¶ 81; 32-8 ¶ 9; 66-1 ¶ 81.

Mulkey testified that he did not recommend approval of Watson's second Sick Leave Pool request because she had been on leave since April 13, 2021, and her continued absence made it difficult to operate the department.  Doc. 32-8 ¶ 10.  Watson has offered no evidence to show that these reasons are false or that the recommendation was somehow related to her protected activity.  Instead, she simply argues that a reasonable jury "may reject [Mulkey's] self-serving explanation," given the timing of his unsuccessful attempts to discipline her months earlier in October 2020 and April 2021.  Doc. 66 at 63-64.  This is insufficient to establish a prima facie case of retaliation and certainly does not suggest that the reasons for Mulkey's recommendation in July 2021 were pretextual.  *See Gogel*, 967 F.3d at 1136.

In sum, none of the incidents identified by Watson alone or together amount to materially adverse actions.  And even if they do, Watson has failed to show the actions

would not have occurred but for her protected activity.  Where applicable, the City has also proffered legitimate nondiscriminatory reasons for the challenged actions, which Watson fails to rebut.  Accordingly, the City's motion for summary judgment on Watson's claims of retaliation and retaliatory harassment (Doc. 32) is **GRANTED**.

**C. Constructive Discharge Claim (Title VII 42 U.S.C. § 2000e et seq.)**

In her first amended complaint, Watson alleges the City "constructively discharged" her when she was "placed on unpaid leave," which she ambiguously suggested occurred on or before April 13, 2022.  Doc. 11 ¶ 96 ("These facts support a constructive discharge which is underscored by Defendant's own April 13, 2022 letter inviting Ms. Watson back because Mr. Davenport was no longer there."), ¶ 182.  Then, in response to the City's argument that her constructive discharge claim was not administratively exhausted (Docs. 32-1 at 9-10; 67 at 15-17), Watson argued that she was discharged "as of" April 13, 2021, when she was placed on *paid* administrative leave after the partition-removal incident.  Doc. 66 at 50-51.  The Court later ordered the parties to address the issue of exhaustion more thoroughly.  Doc. 70 at 44:2-9.  In her supplemental brief, Watson argues only that her "single hostile environment and retaliation claim is timely because at least one of the events comprising her claim occurred within 180 days of her January 7, 2021, EEOC charge."  Doc. 76 at 20.  Watson concedes that her constructive discharge claim was not exhausted because it was not cognizable until well after the EEOC dismissed Watson's EEOC charge and issued its Right to Sue Letter in February 2022.  *Id.* at 20 n.4.  Specifically, Watson was discharged in May 2022, when her "employment was [] separated as a voluntary resignation."  Docs. 32-2 ¶ 89; 39 at 159:4-11; 66-1 ¶ 89; 66-3 ¶ 52.

The City's motion for summary judgment as to this claim (Doc. 32) is

**GRANTED**.[36]

## D. Equal Protection Clause Claims (42 U.S.C. § 1983)

Toms, Mulkey, and Wood argue they are entitled to qualified immunity because

Watson cannot show a violation of the Equal Protection Clause or that their actions

violated clearly established constitutional rights. Docs 33-1 at 7-13; 34-1 at 11-18; 35-1

at 9-17; 67 at 17-30.  Watson's amended complaint asserts only one count against each

individual defendant.  Doc. 11 ¶¶ 127-185.  Generally, Watson alleges that the

defendants were required to take prompt and effective remedial action to end the

sexually hostile workplace environment created by Davenport and that their failure to do

so constitutes deliberate indifference in violation of her Equal Protection right to be free

of sexual harassment in the workplace.  Doc. 66 at 51-67; 76 at 4-19.

"Qualified immunity offers complete protection for individual public officials

performing discretionary functions 'insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known.'"  *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Once discretionary authority is established, the

burden then shifts to the plaintiff to show that qualified immunity should not apply."

*Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W.*

---

[36] Watson's constructive discharge claim fails on the merits too because there is no argument, and certainly no evidence, that in May 2022, when Watson's employment was "separated," that Watson was subjected to working conditions so intolerable that a reasonable person would have felt compelled to resign.  On the contrary, the City provided Watson considerable benefits during her administrative leave and asked her to return to work.  *See Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1282 (11th Cir. 2003); *see also Coppinger v. Wal-Mart Stores, Inc.*, 2009 WL 3163211, at *10 (N.D. Fla. Sept. 30, 2009) ("[I]t would defy common sense to conclude that an employer who invites an employee back to work … is deliberately acting to make the employee's work conditions intolerable.").

*Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009)). Here, Watson has not argued that the individual defendants were not acting within the scope of their discretionary authority. Thus, the defendants are entitled to raise the shield of qualified immunity.

To overcome a qualified immunity defense, Watson must show that (1) the facts, viewed in her favor, establish a constitutional violation as to each defendant; and (2) the unconstitutionality of the defendants' conduct was clearly established at the time of the alleged violation.[37]  *Lewis*, 561 F.3d at 1291. This two-step analysis may be done in whatever order is deemed most appropriate for the case, yet "it is 'often beneficial' to analyze them sequentially." *King v. Pridmore*, 961 F.3d 1135, 1142 (11th Cir. 2020) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014)); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

### 1. Constitutional Violation

Watson argues that Wood, Mulkey, and Toms individually deprived her of her constitutional right to be free from sexual harassment by failing to take steps to eradicate the hostile environment created by Davenport. Docs. 66 at 52-67; 76 at 4-19. Watson cites *Hill v. Cundiff* (Docs. 66 at 56; 76 at 13), which held that: "[A] governmental official ... may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." 797 F.3d 948, 978 (11th Cir. 2015) (alteration in original) (quoting *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1250 (10th Cir.1999)); *see also Williams v. Bd. of Regents of Univ. Sys. of Ga.*,

---

[37] Watson can show that the illegality of the defendant's conduct was clearly illegal in one of three ways: (1) by pointing to a similar case with indistinguishable facts decided by the Supreme Court, Eleventh Circuit, or relevant state supreme court at the time; (2) by identifying a broader, clearly established legal principle that applies to the facts of the case; or (3) by showing the conduct was so plainly unconstitutional that prior case law is unnecessary. *Stalley v. Cumbie*, 124 F.4th 1273, 1284 (11th Cir. 2024) (collecting cases).

477 F.3d 1282, 1300-02 (11th Cir. 2007).  To prevail on a claim of deliberate

indifference to sexual harassment, a plaintiff must prove the individual defendant

"actually knew of and acquiesced in" the discriminatory conduct.  *Hill*, 797 F.3d at 978

(quoting *Murrell*, 186 F.3d at 1250); *see A.P. v. Fayette Cnty. Sch. Dist*., 2023 WL

4174070, at *10 (11th Cir. June 26, 2023).  In *Hill,* the Eleventh Circuit reversed the

grant of qualified immunity to a school principal, who did "virtually nothing" in response

to the rape of a middle school student by another student.[38]  797 F.3d at 956-66, 972-

975, 979.

Watson argues that Toms, Mulkey, and Wood were deliberately indifferent to her

right to be free from sexual harassment because their actions in response to her

complaints about Davenport were so minimal that they were effectively doing nothing.[39]

Docs. 66 at 52-67; 76 at 4-19.  She cites both *Hill* and *Doe v. Sch. Bd. of Broward Cnty.,

Fla*., 604 F.3d 1248, 1260 (11th Cir. 2010), for the proposition that doing "virtually

nothing" in response to harassment complaints can be tantamount to doing nothing at

---

[38] In *Hill*, Principal Blair implemented and enforced a deeply flawed school policy that effectively prevented school officials from disciplining students for sexual harassment unless they were physically caught in the act.  797 F.3d at 958-59.  This policy led to the decision to use a 14-year-old female student, as "bait" in a sting operation to catch another student in the act of sexual harassment, which ultimately resulted in the student's rape.  *Id.* at 960-63.  After the rape, Blair failed to reform this policy or implement any meaningful changes to prevent future sexual assaults—he even defended the school's handling of the situation.  *Id.* at 965, 978-79.

[39] Specifically, Watson argues "Toms was deliberately indifferent to Davenport's sexual harassment … because he did not think the three-day suspension would be enough when he issued that discipline, [he] did not take any steps to find out if Davenport subsequently interacted with her, and [he] was too busy to get involved when he heard about the April 13, 2021, partition incident event though it remained his job to get involved."  Doc. 76 at 15.  Second, Watson argues that Mulkey was deliberately indifferent to her complaints of sexual harassment by disregarding instructions to keep Davenport away from her and failing to discipline Davenport for insubordination when he continued to enter her shared office.  Docs. 66 at 59-66; 76 at 15-18.  Third, Watson argues that Wood was deliberately indifferent to her complaints of sexual harassment, as he was aware of Davenport's continued presence in her shared workspace and failed to take any disciplinary action.  Docs. 66 at 66-67; 76 at 18-19.

all.  Docs. 66 at 54, 56, 66-67; 76 at 13-14.  In *Doe*, the Eleventh Circuit held that a

reasonable jury could find the School Board liable under Title IX for a teacher's sexual

assault of a third student because the school principal's failure to institute *any* corrective

measures in response to two students' prior sexual harassment complaints against the

same teacher could constitute deliberate indifference.[40]  604 F.3d at 1261.  Relying on

these cases, Watson argues that a reasonable official in the individual defendants'

position would not have believed that doing virtually nothing was lawful.  Docs. 66 at 52-

67; 76 at 9-17.  The Court disagrees.

There is no evidence that either Toms, Mulkey, or Wood deprived Watson of her

right to be free from sexual harassment.  Watson's argument that the individual

defendants did "virtually nothing" in response to her sexual harassment complaint is not

true.  Toms authorized an independent investigation of Watson's allegations and

disciplined Davenport based on the investigation's findings.  Docs. 32-2 ¶¶ 39, 46-50;

66-1 ¶¶ 39, 46-50.  Mulkey confronted Davenport, he instructed Davenport not to be

alone with Watson,[41] he reported Watson's complaint to Mize and Toms, and he took

part in the decision-making process regarding Davenport's discipline.  Docs. 32-2 ¶¶ 28-

---

[40] Notably, *Doe* affirmed the grant of qualified immunity to Principal Scavella under 42 U.S.C. § 1983 because Doe could not establish the necessary causal connection between his actions and a constitutional deprivation.  604 F.3d at 1267 ("Although Scavella's acts and omissions reflect serious deficiencies that may be 'clearly unreasonable in light of known circumstances' for purposes of Title IX liability, Doe has not established that these acts and omissions could subject Scavella to supervisory liability for the acts of his subordinates.").  *Doe* did not consider "the possibility of Scavella's § 1983 liability based on a direct causal connection between his actions and omissions and Doe's sexual assault distinct from his potential supervisory liability," but the court said "Scavella would probably be entitled to qualified immunity" because Doe failed to show that Scavella "violated her clearly established Fourteenth Amendment rights by failing to vigorously investigate prior sexual misconduct allegations."  604 F.3d at 1267 n.14.

[41] Watson argues that "[t]his Court must disregard Mulkey's assertion that he directed Davenport to stay away from Watson in April 2021 as opposed to being alone with her, because this is a disputed fact." Doc. 76 at 16.  It is undisputed that Mulkey and Wood met with Davenport on July 13, 2020, and that Mulkey instructed Davenport not to be alone with Watson.  Docs. 32-2 ¶ 29; 66-1 ¶ 29.

30, 33, 46-51; 66-1 ¶¶ 28-30, 33, 46-51.  Mulkey took further steps to minimize interactions between Watson, e.g., buying a $6,000 printer/copier for Davenport's use, and instructing Davenport not to be around Watson at all after the partition-removal incident.  Docs. 32-2 ¶¶ 67, 75; 32-8 ¶¶ 5-6; 66-1 ¶¶ 67, 75; 70 at 35:17-22.  Last, Wood referred Watson to Mulkey for a full report of her complaint, he met with Davenport to obtain his initial response, and again following Couch's report, he checked in with Watson about Davenport's behavior, and he reminded Davenport that he should not be alone with Watson at least once.  Docs. 32-2 ¶¶ 22, 28, 51; 39 at 114:24-115:10; 55 at 92:25-93:14; 66-1 ¶¶ 22, 28, 51.  Not incidentally, Watson approved of the City's response, and it is undisputed that Davenport made no further sexual comments or advances toward her.[42]  Doc. 39 at 91:5-15, 121:7-23.  And when Watson later complained about Davenport's occasional presence in the shared workspace, the City responded.  While Watson faults the extent of the City's response in that regard, it simply is not true to suggest that neither Toms, Mulkey, nor Wood did "virtually nothing" in response to Watson's complaints.

In short, there is also no evidence that either Toms, Mulkey, or Wood acquiesced in or ratified Davenport's alleged harassment of Watson by failing to respond to complaints.

2.  *Clearly Established Law*

Even if Watson had established an equal protection violation, she has not shown that clearly established law put either Toms, Mulkey, or Wood on notice that his conduct

---

[42] Doc. 39 at 91:5-15 ("Q: After your interview by Ms. Couch, were there any other incidents of inappropriate sexual advances or sexual language from … Davenport? …. A:·No.· He did not make any more comments of a sexual nature toward me.  Q: Or any sexual advances? A: No.").

was unconstitutional.  Watson does not argue that a factually similar case provided that notice.  Rather she argues that general statements of the law provide sufficient clear and fair warning to officials, even if the conduct in question has not been found unconstitutional.  Doc. 76 at 2-5.  Because the right to be free from sexual harassment in the workplace generally is clearly established, Watson argues that Toms, Mulkey and Wood each had notice that his specific conduct violated her equal protection rights.  *Id.* at 2-8; s*ee, e.g.*, *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir.1995).  That is not how it works.   Watson still must show that when each defendant acted or failed to act, "the law was developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he [was] doing' violates federal law."  *Braddy v. Fla. Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 801 (11th Cir. 1998) (quoting *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1459 (11th Cir.1997)).  This specific notice is required because qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.  *See Stalley*, 124 F.4th at 1287 ("Qualified immunity in a § 1983 action leaves room for mistaken judgments.") (quoting *Powell v. Snook*, 25 F.4th 912 (11th Cir. 2022)).

Here, Toms, Mulkey, and Wood took significant and admittedly positive and constructive action to address Watson's complaints.  Yet Watson simply repeats her factually inapposite argument that reasonable officials in the defendants' positions would not have believed that doing "virtually nothing" was lawful.  Docs. 66 at 52-67; 76 at 9-17.  Moreover, the Eleventh Circuit has held that defendants far more culpable than

Toms, Mulkey, and Wood were nonetheless entitled to qualified immunity.[43] *See*, *e.g.*, *Braddy*, 133 F.3d at 801. Watson also myopically focuses on what wasn't done to her satisfaction, i.e., address Davenport's occasional presence in her shared workspace instead of what was done. Assuming that the considerable action taken by the defendants was not perfect, Watson cites no law, and the Court has found none, that would have put Toms, Mulkey, or Wood on notice that his conduct was unconstitutional. For example, to address Watson's principal complaint, no law or case would have informed them, under the facts here, that Davenport's occasional presence in a shared office—without more—violated Watson's constitutional rights.[44]

In sum, there is no evidence that either Toms, Mulkey, or Wood deprived Watson of her equal protection rights. Nor on these facts, did clearly established law put Toms, Mulkey, or Wood on notice that their conduct was unconstitutional. Thus, Tom's, Mulkey's, and Wood's motions for summary judgment (Docs. 33; 34; 35) are **GRANTED**.

---

[43] In *Braddy*, the alleged harasser's supervisor was given qualified immunity despite evidence that the supervisor never disciplined the alleged harasser for his initial harassing conduct or took any disciplinary action after the plaintiff initially complained. *Id*. at 800-01, 802-03.

[44] Watson also accuses Wood and Mulkey of retaliating against her in violation of the Equal Protection Clause of the Fourteenth Amendment. Docs. 11 ¶¶ 149-185; 66 at 59 & n.4; 76 at 17-19. First, that argument fails on the merits for the reasons discussed. Second, there is no clearly established right to be free from retaliation under the Equal Protection Clause. *Ratliff v. DeKalb Cnty., Ga.*, 62 F.3d 338, 340 (11th Cir. 1995) ("The right to be free from retaliation is clearly established as a *first amendment* right and as a *statutory* right under Title VII; but no clearly established right exists under the equal protection clause to be free from retaliation."). Although Watson argues that retaliation which is part of or linked to the continued sexually hostile environment remains actionable as a violation of Equal Protection (Docs. 66 at 61-63; 76 at 17-19), Mulkey and Wood would still be entitled to qualified immunity because this right is not clearly established. *Harris v. Monroe Cnty. Pub. Libr. Bd. of Trustees*, 2023 WL 6866602, at *6 (11th Cir. Oct. 18, 2023) (citing *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("[Retaliation] simply does not implicate the Equal Protection Clause.")), *cert. denied*, 144 S. Ct. 1349 (2024).

**IV. CONCLUSION**

For the foregoing reasons, the City's motion for summary judgment (Doc. 32) is

**GRANTED** in part and **DENIED** in part.  The City's motion for summary judgment on

Watson's claim for sexual harassment that occurred after July 10, 2020 (Doc. 32) is

**DENIED**.  The defendants are **GRANTED** summary judgment on all other claims (Docs.

32; 33; 34; 35).


**SO ORDERED**, this 27th day of March, 2025.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT